**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JAMES RANSBERRY,                ) | |
|                       ) | |
|        Plaintiff,       ) | |
|                       ) | |
|        v.                ) | No. 10 C 2911 |
|                       ) | |
| COOK COUNTY SHERIFF TOM DART,   ) | |
| COOK COUNTY, ILLINOIS,        ) | |
|                       ) | |
|        Defendants.      ) | |

**MEMORANDUM OPINION**

Before the court is the defendants' motion for summary judgment. For the reasons explained below, we grant the defendants' motion.

**BACKGROUND**

Plaintiff James Ransberry has sued Cook County Sheriff Tom Dart, in his official capacity, for constitutional violations stemming from his prolonged detention pursuant to a warrant for another person.[1] The Chicago Police Department ("CPD") arrested Ransberry on January 24, 2009 for possession of a controlled substance. (See Defs.' Stmt. ¶ 6; see also Arrest Report, attached as Ex. H to Pl.'s Stmt. of Add'l Facts, at 1.) The next day, Ransberry was taken to the Circuit Court of Cook County for a bond

---

[1] Ransberry joined defendant Cook County, Illinois, solely for indemnification purposes. (See Defs.' Stmt. ¶ 4.)

hearing before Judge Panarese. (Defs.' Stmt. ¶ 8.) Judge Panarese found probable cause to detain Ransberry and set his bond at $30,000. (Id.) He also issued an order directing the Sheriff's Department to place Ransberry in its Electronic Monitoring ("EM") Program. (See Pl.'s Stmt. of Add'l Facts ¶ 14.) Participants in the EM Program are released from jail to their homes, with a requirement of electronic monitoring. After the hearing, Ransberry was transferred to the Cook County Department of Corrections's ("CCDOC") Receiving Division along with his "mittimus" — a document showing the charges against him — and related documents (collectively, the "mittimus pack"). (See Defs.' Stmt. ¶¶ 11, 13.) The parties agree that the following documents were in Ransberry's mittimus pack: (1) his arrest report (see supra); (2) a "Prisoner Transportation Transmittal" that included a recent photograph of Ransberry (see Prisoner Transp. Trans., attached as Ex. D to Pl.'s Stmt. of Add'l Facts); (3) a "Pretrial Services Bond Assessment Form" (see Pretrial Serv. Bond Assess. Form, attached as Ex. I to Pl.'s Stmt. of Add'l Facts); (4) the EM Program Order; and (5) a "LEADS" message printout (see LEADS Message, dated Jan. 25, 2009, attached as Ex. N to Pl.'s Stmt. of Add'l Facts).[2] (See Pl.'s Stmt. of Add'l Facts ¶¶ 17-21.) The LEADS message contained

---

[2] "LEADS" stands for "Law Enforcement Agency Database System." (See Giunta Dep., attached as Ex. C to Defs.' Stmt., at 24.) Law enforcement agencies communicate with each other via LEADS, which one witness described as akin to email.

information about a Jefferson County warrant naming John Wuelling for "failure to appear" on a traffic citation. (See id. at ¶ 21; see also LEADS Message, dated Jan. 25, 2009.) The message included the following details about Wuelling: (1) race (white); (2) date of birth (04/18/62); (3) height (6'1"); (4) hair color (brown); (5) eye color (brown); and (6) skin tone ("medium"). (Pl.'s Stmt. of Add'l Facts ¶ 22.) It also listed his FBI, state identification ("SID"), and Social Security numbers. (Id.) It did *not* include a photograph. It is unclear who generated the message in the first place and linked the warrant to Ransberry. The defendants deny that a Cook County employee created the message, (see Defs.' Am. Resp. to Pl.'s First Set of Interrogatories ¶ 2), and there is some speculation that it came from the CPD. (See Giunta Dep., attached as Ex. C to Defs.' Stmt., at 23.) On the other hand, Ransberry's arrest report stated, "no wants/warrants or investigative alerts on file." (See Pl.'s Stmt. of Add'l Facts ¶ 8.) And Ransberry's bond recommendation form indicated that he had no "Previous Failures to Appear" and no "Pending Cases (excluding current case)." (Id. at ¶ 12.) The most likely explanation for the message's presence in Ransberry's mittimus pack is that, according to the message, Ransberry and Wuelling have the same social security number and an almost-matching birth date.[3] (See Defs.' Stmt. ¶ 21.) But the

---

[3]/ The LEADS report indicates that Wuelling was born on 4/18/62. (See Pl.'s Stmt. of Add'l Facts ¶ 22.) Ransberry was born on 4/16/62. (Id. at ¶ 29.) The Wuelling warrant itself, which the defendants did not obtain until later,

similarities end there. Ransberry is taller (6'3" v. 6'1") and heavier (200 pounds v. 170 pounds), they were born in different states (Mississippi v. Missouri), and perhaps most significantly: Wuelling is listed as white, whereas Ransberry is African American. (<u>See</u> Pl.'s Stmt. of Add'l Facts ¶ 30.)

Officer Peter Giunta "booked" Ransberry. (Defs.' Stmt. ¶ 10.) During the booking process a "body-to-name" check is performed to make sure that the detainee matches the individual described in the mittimus paperwork. (<u>Id.</u> at ¶ 17.) As we understand Giunta's testimony, he first checks to see that the picture in the mittimus pack matches the person he is booking. (<u>See</u> Giunta Dep. at 92.) If necessary, he will go through the mittimus pack to find a "secondary identifier" – a SID number, an FBI number, a Social Security number, or a driver's license number. (<u>Id.</u> at ¶¶ 16-17.) He then enters the detainee's information into the CCDOC's records system ("CMIS"). (<u>See</u> <u>id.</u>; Pl.'s Stmt. of Add'l Facts ¶¶ 26-27.) The system includes an electronic "Personal History Information" form that the booking officer fills out. (<u>See</u> Pl.'s Stmt. of Add'l Facts ¶¶ 26-27; <u>see also</u> CMIS Personal History Information Form, attached as Ex. O to Pl.'s Stmt. of Add'l Facts.) Giunta inputs

_____

indicates that Wuelling was born on 4/15/62. (<u>Id.</u> at ¶ 34.) Ransberry and Wuelling also had the same SID number, although the plaintiff contends that the defendants did not possess Ransberry's SID number to make a comparison. (<u>See,</u> <u>e.g.</u>, Pl.'s Resp. to Defs.' Stmt. ¶ 20.)

the inmate's internal record ("IR") number,[4] and if the person has been booked before — and Ransberry had been — then the system automatically populates the fields with the inmate's other information. (See Pl.'s Stmt. of Add'l Facts ¶¶ 26-27; Defs.' Stmt. ¶ 18; Giunta Dep. at 31.) Giunta testified that if he had noticed a discrepancy in the warrant information — including the fact that Wuelling was described as white — then he would have notified his supervisor to resolve the issue. (See Defs.' Stmt. ¶ 12.)[5] But he could not recall whether he saw the Wuelling LEADS message. (See Giunta Dep. at 52.) Ransberry eventually made his way to the Sheriff's EM Unit, a division of the Sheriff's Department of Community Supervision and Intervention ("DCSI"). (See Defs.' Stmt. ¶ 22.) Although Judge Panarese ordered Ransberry to participate in the program, DCSI has authority to determine that an individual is ineligible. (Id. at ¶ 34.) Ineligible detainees include individuals who are subject to an outstanding warrant. (Id.; see also id. at ¶ 36.) Staff at the "Technical Services Section" of the EM Unit interviewed Ransberry and determined that the Wuelling warrant made him ineligible for EM. (See Pl.'s Stmt. of Add'l Facts ¶ 31; see also EM Interview, dated Jan. 25, 2009,

---

[4] "An IR number is an 'internal record number' corresponding to a person's fingerprint that is used by Chicago and suburban Chicago law enforcement." (Defs.' Stmt. ¶ 19.)

[5] Ransberry objects that this statement is irrelevant because the actual warrant was not in the mittimus pack. (See Pl.'s Resp. to Defs.' Stmt. ¶ 12.) But Giunta later testified that the same policy applies to LEADS messages containing non-matching information. (See Giunta Dep. at 62-64.)

attached as Ex. Q to Pl.'s Stmt. of Add'l Facts ("Reason for not out on E.M.: Hold Jefferson Co.").)[6]  So, he was confined to lockup.

Ransberry spoke to two people about his EM status on the day that he was booked: a jail guard and a caseworker.  (See Ransberry Dep. at 43-46, 50-51.)  According to Ransberry, the guard told him that he was not eligible for EM because of a "seatbelt ticket." (See id. at 44.)  Ransberry denied that he had ever received such a ticket.  (Id. ("I told him it couldn't be me because I never had a seatbelt ticket in my life.  I've never been pulled over in my life.").)  The record does not include the contents of Ransberry's conversation with the caseworker.  (See id. at 50-51.)  Ransberry next appeared in court on February 11, 2009.  (Defs.' Stmt. ¶ 39.) Neither he nor his attorney — Assistant Public Defender Candace Alexander — raised the EM issue.  (Id.)  Between February 11, 2009 and February 26, 2009, Ransberry only spoke with his cellmate about his predicament.  (Id. at ¶ 40.)  On February 26, 2009, Ransberry appeared before Judge Lawrence Flood, who reduced his bond from $30,000 to $10,000.  (Id. at ¶ 41.)  During the hearing, the Assistant State's Attorney volunteered that Ransberry was "on EM at some point." (See Trans. of Hearing, dated Feb. 26, 2014, attached as Ex. I to Defs.' Stmt., at 6.)  In response, Ransberry's

---

[6]/  A Records Division employee, Miyoka Davenport, notified the court that Ransberry had been deemed ineligible to participate in the program because of the Jefferson County warrant.  (See "Court Communications Letter," dated Jan. 27, 2009, attached as Ex. 10 to Brown Dep.; see also Brown Dep. at 155-56.)

attorney, Assistant Public Defender Stephanie Schlegel, addressed Ransberry: "You didn't get EM, did you? I think they screened for it. He's got a minor like warrant somewhere in some other county." (Id.) Later in the hearing, Schlegel stated that Ransberry could "post approximately two to three hundred dollars once he gets rid of this minor warrant." (Id. at 9.) Schlegel believed that the warrant was for "drinking in the car or something like that. He wasn't the driver. He was a passenger in the car and was ticketed for it. So I am going to try to track that down for him." (Id.) Ransberry said nothing during this colloquy. On March 5, 2009, Miyoka Davenport, an employee in the Sheriff's Department's Records Division, requested and received a hard copy of the Wuelling warrant from Jefferson County. (See Pl.'s Stmt. of Add'l Facts ¶ 33).) Davenport testified that she could not recall why she had requested the warrant at that time. (See Davenport Dep. at 48-49.)

The officer in charge of the Records Division at that time, Desiree Zeno-Johnson, speculated that it might have been done in connection with a routine "system check." (See Zeno-Johnson Dep. at 84-86.) There is no evidence in the summary-judgment record that Schlegel, or anyone else working on Ransberry's behalf, contacted the Records Division at this time.

Between February 26, 2009 and April 1, 2009, Ransberry discussed his EM status with Schlegel and his cellmate, only. (Defs.' Stmt. ¶ 43.) When he appeared in court again on April 1,

2009, Schlegel told the court that her client was being incarcerated pursuant to a warrant for a different person. (Id. at ¶ 45.) But the court denied her request for home monitoring because the warrant was still in place. (See Trans. of Hearing, dated April 1, 2009, attached as Ex. J to Defs.' Stmt., at 3-4.) Schlegel appeared to indicate that she would take steps to clarify the mistake. (See id. at 4 ("I would have to do that this week.").) Two weeks later, on April 15, 2009, she sent two faxes to the Records Division asking them to remove the hold on Ransberry. (See Fax #1, dated April 15, 2009, attached as part of group Ex. U to Pl.'s Stmt. of Add'l Facts, at 1 ("Please remove the hold from Jefferson County, IL on case # 02 TR 3510. It is NOT Mr. Ransberry's case!"); see also Fax #2, attached as part of Group Ex. U to Pl.'s Stmt. of Add'l Facts, at 1 (asking the recipient to disregard the prior fax, but repeating her request to lift the hold).) The lieutenant in charge of the Records Division on that date, Nancy Alvarez, testified that she could not recall receiving Schlegel's faxes. (See Alvarez Dep., attached as Ex. F to Pl.'s Stmt. of Add'l Facts, at 76-77.) If she had seen them, she would have notified her supervisor and "immediately conducted an investigation." (See id.) It is unclear whether Schlegel ever followed up, and Ransberry effectively dropped the issue. He testified that he did not speak to Schlegel about his EM status between the April 1, 2009 hearing and his bench trial on May 5,

2009. (Defs.' Stmt. ¶ 47.) Nor did anyone raise the issue during the trial, which resulted in Ransberry's acquittal. (Id. at ¶ 50.)

Ransberry believed that he would be released after the trial, but a jail guard informed him that he "had a hold" and "wasn't going nowhere." (Id. at ¶ 53.) In response, Ransberry "didn't say nothing. I just went back to my cell." (Id.; see also Ransberry Dep. at 58 ("After he told me I had that hold and I wasn't going nowhere, I went back to my cell and laid down and I just read some books and I cried a while, cried myself to sleep.").) CCDOC planned to transport Ransberry to Jefferson County on the next regularly scheduled trip. (Id. at ¶ 64.) But he was released on May 11, 2009 before traveling to Jefferson County. (Id. at ¶ 65.) Although neither side addresses the issue in their Rule 56.1 statements, it appears that someone in the Records Division noticed that Wuelling and Ransberry were not the same race and asked Jefferson County to confirm that they wanted to proceed with extradition. (See LEADS Message, dated May 11, 2009, attached as Ex. 9 to Davenport Dep. ("Our subject is male/black. The subject that is wanted by your [department] is a male/white. Can you please advise that your want is not for Ransberry, James . . . .).) Jefferson County stated that it did not want to extradite him, (see LEADS Message, dated May 11, 2009, attached as Ex. 10 to Davenport Dep.), which presumably led to his release.

**DISCUSSION**

Ransberry has filed § 1983 claims for violations of the Fourth (Count IV), Eighth (Count VI), and Fourteenth (Counts II and III) Amendments. (See Fourth Am. Compl. ¶¶ 45-65.) Although he has pled a Monell claim as a separate count, (see id. at ¶¶ 38-44 (Count I)), he cannot prevail on any of his claims if he cannot satisfy Monell's requirements for municipal liability. Only Sheriff Tom Dart (sued in his official capacity), and Cook County (joined for indemnification, only), remain in the case. The defendants have moved for summary judgment on essentially three grounds: (1) Ransberry did not have a protected liberty interest in being placed in the EM program (accounting for 94 of the 100 days he spent in jail); (2) the defendants were simply carrying out Judge Panarese's detention order; and (3) Ransberry has not developed sufficient evidence to support liability under Monell. We will confine our discussion to the defendants' third argument, which we consider dispositive.

**A.    Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "The court need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

## B. **Monell** Liability

To survive summary judgment, Ransberry "must present evidence demonstrating the existence of an official policy, widespread custom, or deliberate act of a county decision-maker of the municipality or department." King v. Kramer, 680 F.3d 1013, 1020 (7th Cir. 2012) (citation and internal quotation marks omitted). He must also show that the defendants' policy or practice caused the alleged constitutional violations. Id.

### 1. Official Policy

Ransberry contends that the Sheriff's Department's official polices violated his constitutional rights. "A plaintiff can establish an official policy through '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional

injury was caused by a person with final policymaking authority.'" _Teesdale v. City of Chicago_, 690 F.3d 829, 833 (7th Cir. 2012) (citations and internal quotation marks omitted).

### a. Express Policy

"The express policy theory applies, as the name suggests, where a policy explicitly violates a constitutional right when enforced." _Calhoun v. Ramsey_, 408 F.3d 375, 379 (7th Cir. 2005). In _Monell_, the defendant's express policy required pregnant employees to take leaves of absence before it was medically necessary to do so. _Monell v. Department of Social Services of City of New York_, 436 U.S. 658, 660-62 (1978). This policy violated the Court's holding in _Cleveland Board of Education v. LaFleur_, 414 U.S. 632, 651 (1974), which held that a similar policy violated the Fourteenth Amendment's Due Process Clause. "Obviously, it requires only one application of a policy such as this to satisfy fully _Monell_'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy." _City of Oklahoma City v. Tuttle_, 471 U.S. 808, 822 (1985); _see also Calhoun_, 408 F.3d at 379-80.

Ransberry challenges two express policies: (1) the Sheriff's Department's policy of deferring to the arresting agency's identification (_see_ Pl.'s Stmt. of Add'l Facts ¶ 1); and (2) its policy of "giv[ing] attention to only 'main identifiers,' which include the social security number, the FBI number and [SID

number]." (See id. at ¶ 2.)  The Sheriff's Department does not, as a matter of course, investigate warrants naming (or purporting to name) detainees.  But it does not simply abdicate responsibility for identification.  Cf. Alexander v. Squadrito, 152 F.3d 564 (7th Cir. 1998).  In Alexander, a jail official placed the plaintiff on a "will call" list of detainees awaiting transportation to court. Id. at 567-58.  A jail official contacted the warrants division, and the warrants division called the court to provide the plaintiff's case number, thereby notifying the court that the plaintiff was in the sheriff's department's custody.  Id. at 568. Someone in the warrants division transposed a digit in the plaintiff's case number, so the court never called for the plaintiff to appear.  Id.  During the 57 days that he spent in lockup without a court appearance, the plaintiff repeatedly asked his jailers when he would be taken to court.  Id.  Each time they responded that he would have to wait for the court to call him. Id.  He submitted grievance forms on four or five occasions, but the guards refused to accept them.  Id.  The Alexander Court considered it a "close case" whether the will-call policy constituted deliberate indifference.  Id. at 577-78.  In essence, the sheriff's department disclaimed any responsibility for the plaintiff's appearance in court once it placed him on the will-call list.  Id. at 578.  Nevertheless, the Court concluded that the policy was not unconstitutional on its face because the defendant gave inmates the opportunity to submit formal complaints.  Id. at

579. It reversed summary judgment, however, with respect to the plaintiff's claim that "the jail had either a policy or custom of refusing to accept complaint forms from detainees requesting information on their will call status." Id. at 579.

This case is superficially similar to Alexander insofar as the Sheriff's Department relies on another agency to make the initial identification. But there are important differences. Giunta testified that the Receiving Department compares the detainee with the warrant information in the mittimus pack. If he sees discrepancies, he notifies his supervisor to resolve the issue. So, at that point, two agencies have inspected the warrant information: the arresting agency and the Receiving Department. The Records Division does not, on its own initiative, reconfirm that the detainee is the person named in the warrant. But the lieutenants in charge of the Records Division during Ransberry's incarceration — Desiree Zeno-Johnson and Nancy Alvarez — both testified that it was their policy to investigate complaints from detainees and their representatives. (See Zeno-Johnson Dep. at 26-29; Alvarez Dep. at 76-77.) Ransberry's attorney contacted the Records Division in April 2009. Although no one responded to Schlegel's faxes, there is no evidence that this was due to an official policy. Alvarez, who had moved to the Records Division shortly before Schlegel sent the faxes, testified that she would have "immediately" notified a supervisor if she had seen them. (See Alvarez Dep. at 76-77.) Zeno-Johnson testified similarly, but

it appears that she took a more active role in resolving warrant complaints. (See Zeno-Johnson Dep. at 28-37 (testifying that she would personally review the mittimus pack and communicate directly with detainee's attorney to resolve disputes).) Finally, as in Alexander, the CCDOC gives inmates the opportunity to file grievances. But unlike the plaintiff in Alexander, Ransberry did not attempt to utilize the grievance process. We conclude that Ransberry has not presented sufficient evidence that the Sheriff Department's policy of deferring to the arresting agency's identification is unconstitutional.

With respect to the second alleged policy, Ransberry misstates the record. Records Division employees are trained to consider "main identifiers" more reliable than "secondary identifiers," (see Davenport Dep. at 68), but they may consider both. (See, e.g., Zeno-Johnson Dep. at 27-28; Davenport Dep. at 67.) Indeed, in his response to the defendants' statement of facts, Ransberry denies that Records Division employees only consider main identifiers. (See Pl.'s Resp. to Defs.' Stmt. ¶ 61 ("Deputy Davenport did not testify that CCDOC Records division employees look only to these main identifiers.").) Moreover, it appears that the racial discrepancy between Wuelling and Ransberry prompted a Records Division employee to ask Jefferson County in May 2009 whether it really wanted to extradite Ransberry. (See LEADS Message, dated May 11, 2009, attached as group Ex. 9 to Davenport Dep. (requesting a picture of Wuelling from Jefferson County because Ransberry is

African American).)  Giunta, the booking officer when Ransberry
first appeared at the jail, works in a separate department
(Receiving).  But he also testified that he would have notified his
supervisor if he had noticed that Ransberry was African American
and Wuelling was white.  (<u>See</u> Giunta Dep. at 61-62.)  (Recall that
Giunta could not remember whether the LEADS message regarding
Wuelling was in the mittimus pack that he received.)  Ransberry has
not cited any authority (controlling or otherwise) holding that a
law enforcement agency's policy of emphasizing one set of
identifiers over another is unconstitutional.

Ransberry also asserts that there is a "gap" in the Sheriff's
Department's policy: "[t]he Records Division has no official policy
regarding what to do when somebody makes a complaint about an
inmate being held on a warrant for the wrong person." (Pl.'s Stmt.
of Add'l Facts ¶ 5.)[7]  To prevail on this type of claim, Ransberry
must show more than one instance where the gap in the defendant's
policy caused a constitutional violation. <u>See</u> <u>Calhoun</u>, 408 F.3d at
380 (citing <u>Tuttle</u>, 471 U.S. at 822-23).[8]  First, Ransberry is

---

[7]  We assume that Ransberry intended to cite Alvarez's deposition for this
proposition, not Christopher Rohloff's.  (<u>Cf.</u> Defs.' Resp. to Pl.'s Stmt. of
Add'l Facts ¶ 5 (pointing out that Ransberry has cited pages in Christopher
Rohloff's deposition that do not exist)).

[8]  In dicta, the Supreme Court has left the door open to this type of
<u>Monell</u> claim — i.e., one not based on an express policy — premised on only a
single incident.  <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 n.10 (1989);
<u>Calhoun</u>, 408 F.3d at 381. But this exception is narrow.  <u>See</u> <u>Connick v. Thompson</u>,
131 S.Ct. 1350, 1356-61 (2011) ("Failure to train prosecutors in their <u>Brady</u>
obligations does not fall within the narrow range of <u>Canton</u>'s hypothesized
single-incident liability."); <u>Board of County Com'rs of Bryan County, Okl. v.
Brown</u>, 520 U.S. 397, 409 (1997) ("In leaving open in <u>Canton</u> the possibility that
a plaintiff might succeed in carrying a failure-to-train claim without showing
a pattern of constitutional violations, we simply hypothesized that, in a narrow

incorrect that the Records Division had no policy with respect to complaints about mistaken identification. Alvarez testified she was not aware of any official Records Division policies "whatsoever." (See Alvarez Dep. at 53.) But as we discussed before: (1) she specifically testified that she would have "immediately" notified her supervisor if she had seen Schlegel's faxes, (see Alvarez Dep. at 76-77); and (2) Zeno-Johnson testified that she would have personally investigated any inquiry or complaint from a detainee or attorney. (See Zeno-Johnson Dep. at 28-37.) So, the Records Division did have a policy for handling complaints about mistaken identity. Second, Ransberry has not cited any evidence of other constitutional violations stemming from this alleged gap in the Sheriff's Department's policy. This is fatal to his claim. See Calhoun, 408 F.3d at 380-81.

### b. Widespread Practice

Ransberry also argues that he "has put forth enough evidence to establish a widespread practice and create a genuine issue of material fact." (Pl.'s Mem. at 12.) A widespread practice, like a claim based on gaps in the defendant's official policy, requires proof of more than one incident. Calhoun, 408 F.3d at 380-81.[9] Again, Ransberry has not cited any other instance where the

---

range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."). Ransberry has not argued that his claim falls within this narrow exception.

[2/] This is subject, again, to the caveat we just discussed. (See supra n. 8.)

Sheriff's Department's practices caused an individual to be erroneously detained for an extended period of time. He argues that this case is "practically indistinguishable," (Pl.'s Resp. at 13), from Perez-Garcia v. Village of Mundelein, 396 F.Supp.2d 907 (N.D. Ill. 2005). The plaintiff's claim in that case is somewhat similar to Ransberry's claim here. But Ransberry incorrectly states that the Perez-Garcia court denied a motion for summary judgment. (See Pl.'s Resp. at 13 (stating that the court "denied summary judgment because the plaintiff proved a genuine issue of material fact existed as to whether the jail's policies and procedures that 'did not require confirmation of the detainee's identity' violated the detainee's due process rights").) The court denied a *motion to dismiss*. See Perez-Garcia, 396 F.Supp.2d at 910. And it expressly relied on the procedural posture of the case to distinguish Palmer v. Marion County, 327 F.3d 588 (7th Cir. 2003), which upheld summary judgment because the plaintiff in that case had not produced evidence of a widespread practice. See id. at 596 ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference."); see also Perez-Garcia, 396 F.Supp.2d at 911 ("Palmer was decided on summary judgment and considered whether there was sufficient evidence in the record to establish the alleged jailhouse practice. Palmer did not relate to pleading

requirements.").[10]  Ransberry's "widespread practice" theory fails because he has not produced  evidence of other constitutional violations.

### 2.   Failure to Train

Finally, Ransberry argues that the Sheriff's Department's failure to train its employees caused his prolonged detention. (See Pl.'s Stmt. of Add'l Facts ¶¶ 3-4, 6.)  "The inadequacy of police training may serve as the basis for § 1983 liability, but only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Hollins v. City of Milwaukee, 574 F.3d 822, 827 (7th Cir. 2009); see also Connick, 131 S.Ct. at 1359 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").  A plaintiff can establish deliberate indifference by showing that the municipality: (1) "fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation;" and/or (2) "fails to provide further training after learning of a pattern of constitutional violations by the police."  Dunn v. City of Elgin, Illinois, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted).  Ransberry cites Zeno-Johnson's and Alvarez's testimony

---

[10]/  The court later denied the defendant's motion for summary judgment on the plaintiff's claim for state law false imprisonment.  See Perez-Garcia v. Village of Mundelein, No. 04 C 7216, 2005 WL 991783, *1, *6 (N.D. Ill. April 13, 2005).  But that decision did not address Monell liability at all.

that they did not receive formal training to perform their jobs as Records Division lieutenants.  (See Pl.'s Stmt. of Add'l Facts ¶¶ 3-4.)[11]    Ransberry  has  not  produced  evidence  that  prolonged detention  based  upon  mistaken  identification  is  a  "recurring situation."   See Dunn, 347 F.3d at 646.   Although Ransberry does not cite this testimony in his Rule 56.1 statement, some witnesses acknowledged that mistaken identification can and does happen.   But the  Constitution  does  not  require  "error-free"  investigations. Baker v. McCollan, 443 U.S. 137, 146 (1979) ("[T]he official charged  with  maintaining  custody  of  the  accused  named  in  the warrant  [is  not]  required  by  the  Constitution  to  perform  an error-free investigation of such a claim."). Ransberry told only two unnamed prison employees that he was not subject to the warrant, both times on his first day of incarceration.   In the ensuing months, he appeared in court three times before he was released.   And at no point during his incarceration did he file a formal grievance.   There is no evidence that, under the defendants' current policies, prolonged detention based upon mistaken identity is a "recurring situation."   Nor is there any evidence that the

---

[11]/ Ransberry misstates the record in several respects.  Zeno-Johnson (not Alvarez) was the lieutenant in charge of the Records Division from 2004 until April 12, 2009.  (See Zeno-Johnson Dep. at 19; cf. Pl.'s Stmt. of Add'l Facts ¶¶ 3-4.)  Before that she worked as an officer and a sergeant in the same division. (See Zeno-Johnson Dep. at 14.)  Alvarez became the lieutenant in charge of the Records Division on April 12, 2009.  (See Alvarez Dep. at 15; cf. Pl.'s Stmt. of Add'l Facts ¶¶ 3-4.)  Alvarez, who all but admitted that she was a poor employee, lasted only nine months in the position.  (See id.; see also id. at 18 (testifying that she had, and still has, only a vague idea of what the Records Division does).)

defendants ever learned of a "pattern of constitutional violations." Id.

Finally, Ransberry has not cited sufficient evidence establishing a causal link between the officers' lack of formal training and his injury. Both Zeno-Johnson and Alvarez testified that they would have investigated discrepancies in the warrant if they had been brought to their attention. (See Zeno-Johnson Dep. at 26-29; Alvarez Dep. at 76-77.) There is no evidence that either officer was ever notified. Zeno-Johnson left the Records Division before Schlegel sent the faxes claiming that Ransberry was being held on a warrant for a different person. Alvarez was in charge at that time, but she testified that she could not recall seeing Schlegel's faxes. Even if we assume that Alvarez received the faxes and ignored them, or that she or some other Records Division employee carelessly misplaced them, this is insufficient to demonstrate deliberate indifference at the municipal level. At some point, the Sheriff's Department must rely on its employees to perform their basic job duties. Cf. Calhoun, 408 F.3d at 380 ("No government has, or could have, policies about virtually everything that might happen.").

## CONCLUSION

The defendants' motion for summary judgment [160] is granted.

DATE:     March 19, 2014

ENTER:

_____

John F. Grady, United States District Judge